IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **RICHARD POLLOCK**, an adult individual, **CHERYL POLLOCK**, an adult individual, **PAUL L. KUTCHER**, an adult individual, and **CYNTHIA P. KUTCHER**, an adult individual, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) 2:12cv130 ) **Electronic Filing** |
| **NATIONAL FOOTBALL LEAGUE** and **DALLAS COWBOY FOOTBALL CLUB, LTD.**, | ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM ORDER

AND NOW, this 15th day of March, 2013, upon due consideration of the defendants' motions to dismiss and to dismiss for lack of subject matter jurisdiction and the parties' submissions in conjunction therewith, IT IS ORDERED that the motions [56, 59, 96, 98] be, and the same hereby are, granted. Accordingly, plaintiffs' tort claims are dismissed pursuant to Rule 12(b)(6) and this action is dismissed for want of subject matter jurisdiction and without prejudice to plaintiffs refiling the action in state court as authorized by 42 Pa. C. S. § 5103(b).

I. **Background And Procedural History**

In early January 2011, plaintiffs submitted three applications for Super Bowl XLV tickets (the "tickets") through a ticket lottery with the Pittsburgh Steelers Sports, Inc. ("Steelers"), an agent of the National Football League ("the NFL"). First Amended Complaint at ¶¶ 17-19. Plaintiffs submitted $800.00 for each ticket with each application. Id. at ¶ 17-18. The NFL formally accepted two of plaintiffs' applications and issued four tickets to them which purported to provide admission and seats at Super Bowl XLV in Arlington, Texas on February 6, 2011. Id.

at ¶¶ 21-23, 26-27.  In addition to designating a specific seat for the ticket holder, each ticket included terms and conditions which stated in pertinent part that the ticket "grants entry in the stadium and a spectator seat for the game."  Id. at ¶ 28.

The Dallas Cowboys Stadium in Arlington had a normal seating capacity of 80,000.  Id. at 29.  The NFL and the Dallas Cowboys Football Club, Ltd., desired to construct temporary seating to increase the stadium's seating capacity for the Super Bowl to over 100,000.  Id. at ¶ 30.  Agents of defendants arranged with the City of Arlington to (1) begin construction of the temporary seating prior to submitting complete construction documents and (2) thereafter obtain the needed occupancy permits prior to game day.  Id. at ¶¶ 35-36.  This process involved a "phased approval" and the permit was "conditionally issued."  Id. at ¶ 37.

Defendants' agents commenced and progressed with the construction without knowing whether the seating could be completed and occupancy permits obtained for the seating prior to game day.  Id. at ¶¶ 37-38.  During the three weeks of construction defendants' agents received numerous communications indicating that there were defects in the building plans and a number of issues needed to be addressed before the seats would be designated as safe and available on game day.  Id. at ¶¶ 39-44.  A number of issues remained as late as the night before game day. Id. at ¶¶ 43-44.

Although being aware of the issues and problems plaguing the construction of the temporary seating, defendants failed to commit sufficient resources to the undertaking so that an occupancy permit could be issued for every seat by game day.  Id. at ¶ 47.  Defendants' seating contractor failed to have adequate manpower available and working on the night before game day and at game time defendants had failed to complete the construction of at least 2400 seats. Id. at ¶¶ 45-47.  As a result, plaintiffs were (1) initially denied entry into the stadium, (2) required to spend hours traversing about and around the stadium in an effort to gain admission,

(3) unable to obtain information about why they were unable to get in, (4) relocated to a section within the stadium that did not have seats and had an obstructed view, and (5) only able to watch the game without a seat either on monitors or with an obstructed view of the field.  Id. at ¶¶ 60-117.  Defendants failed to make plaintiffs aware at any time prior to the start of the game that the construction of their seats had not been completed and they had not obtained an occupancy permit for those temporary seats.  Id. at ¶ 49.

Plaintiffs placed substantial reliance on the issuance of the tickets, made arrangements for all necessary travel and accommodation costs needed to attend the game and engaged in all the fanfare that accompanies a sports fan traveling to the Super Bowl to route for his or her team.  Referenced losses and injuries include the costs of the tickets, airfare, car rental, lodging, food and beverages, vacation time, loss of a once-in-a-lifetime opportunity, punitive and exemplary damages, treble damages, attorneys fees and costs, and pre- and post-judgment interest.

In their initial complaint plaintiffs alleged that their Super Bowl tickets constituted valid, enforceable contracts against the NFL and asserted a claim for breach of contract based upon its alleged failure to provide the seats designated on the face of the tickets.   Complaint (Doc. No. 1) at ¶¶ 129-140.  Defendants moved to dismiss all of plaintiffs' tort claims under Pennsylvania's "economic loss"/"gist of the action" doctrine.  See generally Defendants' Motions to Dismiss Plaintiffs' Original Complaint (Doc. No.s 13, 19) and Briefs in Support (Doc. No.s 14, 20).  Plaintiffs then moved to amend their complaint.  After receiving leave to amend, plaintiffs abandoned their claim for breach of contract and re-asserted four tort claims arising out of the NFL's failure to provide the seating reflected by the tickets: fraudulent misrepresentation by concealment (Count I), negligent/gross negligent misrepresentation by concealment (Count II), Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL") (Count IV),

and fraudulent inducement (Count V). Plaintiffs reasserted one claim for negligent misrepresentation against the Dallas Cowboys (Count III).

Defendants contend that all of plaintiffs' claims in the amended complaint are barred by the gist of the action/economic loss doctrine notwithstanding plaintiffs' decision not to re-assert a breach of contract claim. Additionally, the NFL contends that the claims for fraudulent misrepresentation, negligent misrepresentation, consumer protection and fraudulent inducement fail because the NFL did not make any misstatement of fact, there was no duty to disclose the allegedly concealed information, and plaintiffs have failed to plead that they were induced by any misrepresentation or omission when they submitted the applications. And the Dallas Cowboys argue that there was no contractual or other relationship between it and plaintiffs and it is not amenable to suit in this jurisdiction in any event.

Plaintiffs maintain that no contractual relationship existed between them and the NFL and/or the Dallas Cowboys. Furthermore, defendants had a duty independent of any contractual relationship to disclose that the tickets were issued for seats that had not yet been constructed and for which no occupancy permit had been issued. That duty arose under Restatement Second of Torts §§ 551(1) & (2) and 552 because plaintiffs had no access to this critical information and defendants had a pecuniary interest in consummating the ticket transaction. Defendants breached that duty by knowing (or having reason to know) that there was no assurance that an occupancy permit would be obtained and failing to disclose that information in time for plaintiffs to make an informed decision about whether to purchase the tickets.

## II.  Standard Of Review

It is well-settled that in reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "[t]he applicable standard of review requires the court to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view

them in the light most favorable to the non-moving party." Rocks v. City of Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989). Under the Supreme Court's decision in Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 561 (2007), dismissal of a complaint pursuant to Rule 12(b)(6) is proper only where the averments of the complaint plausibly fail to raise directly or inferentially the material elements necessary to obtain relief under a viable legal theory of recovery. Id. at 544. In other words, the allegations of the complaint must be grounded in enough of a factual basis to move the claim from the realm of mere possibility to one that shows entitlement by presenting "a claim to relief that is plausible on its face." Ashcroft v. Iqbal, – U.S. –, 129 S. Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. In contrast, pleading facts that only offer "'labels or conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,'" nor will advancing only factual allegations that are merely consistent with a defendant's liability. Id. Similarly, tendering only "naked assertions" that are devoid of "further factual enhancement" falls short of presenting sufficient factual content to permit an inference that what has been presented is more than a mere possibility of misconduct. Id. at 1949-50; see also Twombly, 550 U.S. at 563 n. 8 (A complaint states a claim where its factual averments sufficiently raise a "'reasonably founded hope that the [discovery] process will reveal relevant evidence' to support the claim.") (quoting Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336, 347 (2005) & Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 741 (1975)); accord Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997) (a court need not credit "bald assertions" or "legal conclusions" in assessing a motion to dismiss) (citing with approval Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1357 (2d ed.1997) ("courts, when examining 12(b)(6) motions,

5

have rejected 'legal conclusions,' 'unsupported conclusions,' 'unwarranted inferences,' 'unwarranted deductions,' 'footless conclusions of law,' or 'sweeping legal conclusions cast in the form of factual allegations.'").

This is not to be understood as imposing a probability standard at the pleading stage. Iqbal, 129 S. Ct. at 1949 ("The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."); Phillips v. County of Allegheny, 515 F.3d 224, 235 (3d Cir. 2008) (same). Instead, "[t]he Supreme Court's Twombly formulation of the pleading standard can be summed up thus: 'stating ... a claim requires a complaint with enough factual matter (taken as true) to suggest the required element ... [and provides] enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.'" Phillips, 515 F.3d at 235; see also Wilkerson v. New Media Technology Charter School Inc., 522 F.3d 315, 321 (3d Cir. 2008) ("The complaint must state 'enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element.'") (quoting Phillips, 515 F.3d at 235) (citations omitted). "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Twombly, 550 U.S. at 563.

**III.     Negligent Misrepresentation Claim Against Defendants**

Plaintiffs' claims for negligent misrepresentation (Counts II and III) are barred by the gist of the action doctrine because the tort claims are nothing more than a breach of the contractual obligations created by the purchase of the Super Bowl tickets. The gist of the action doctrine "is designed to maintain the conceptual distinction between breach of contract claims and tort claims." eToll, Inc. v. Ellias/Savion Advertising, Inc., 811 A.2d 10, 14 (Pa. Super. 2002). "As a practical matter, the doctrine precludes plaintiffs from recasting ordinary breach of contract claims into tort claims." Id.

6

In general, the difference between contract claims and tort claims depends upon the origin of the duties alleged to have been breached by the defendant's conduct. "Tort actions lie for breaches of duties imposed by law as a matter of social policy, while contract actions lie only for breaches of duties imposed by mutual consensus agreements between particular individuals." Id. (quoting Bash v. Bell Tel. Co., 601 A.2d 825, 829 (Pa. Super. 1992)).

The two types of causes of action are not mutually distinct. Id. Instead, it is "possible that breach of contract also gives rise to an actionable tort." Id. But "to be construed as in tort, however, the wrong ascribed to [the] defendant must be the gist of the action, the contract being collateral." Id. (quoting Bash, 106 A.2d at 829). "In other words, a claim should be limited to a contract claim when 'the parties' obligations are defined by the terms of the contracts, and not by the larger social policies embodied in the law of torts.'" Id. (quoting Bohler-Uddeholm Am., Inc., v. Ellwood Group, Inc., 247 F.3d 79, 104 (3d Cir. 2001), cert. denied, 534 U.S. 1162 (2002)).

Whether the gist of the action doctrine applies to bar a claim is a question of law. Id. A number of courts have observed:

> The test is not limited to discrete instances of conduct; rather, the test is, by its own terms, concerned with the nature of the action as a whole.
>
> "Gist" is a term of art in common law pleading that refers to the "essential ground or object of the action in point of law, without which there would be no cause of action." Blacks Law Dictionary 689 (6th ed. 1990). "Action" is defined by Black's Law Dictionary as "a lawsuit brought in a court; a formal complaint within the jurisdiction of a court of law . . . . The "gist of the action" test, then, is a general test concerned with the "essential ground," foundation or material part of an entire "formal complaint" or lawsuit.

eToll, 811 A.2d at 15 (quoting American Guar. and Lia. Ins. Co., v. Fojanini, 90 F. Supp.2d 615, 622-23 (E.D. Pa. 2000)).

7

Courts have applied the gist of the action doctrine to bar tort claims in four separate settings: (1) where the claims arise from a contract between the parties; (2) where the duties allegedly breached were created and grounded in the contract itself; (3) where the liability stems from a contract; or (4) where a tort claim essentially duplicates a breach of contract claim or its success is wholly dependent on the terms of a contract. eToll, 811 A.2d at 20. And until the Supreme Court of Pennsylvania holds otherwise, the Superior Court has determined that "the gist of the action doctrine should apply to claims for fraud in the performance of a contract." Id.

Here, the parties' obligations arise solely from plaintiff's purchase and the NFL's sales of the Super Bowl tickets. Any duties imposed on defendants were created as a result of those transactions. And the alleged breach was the failure to provide the very essence of what the parties' contract obligated defendants to provide: admission to and a spectator seat for the game. The asserted breach gives rise to liability grounded in the contract and plaintiffs' damages result from defendants' failure to provide what was promised by sales of the tickets.

Plaintiff's effort to convert the gravamen of the complaint into a tort action by referencing defendants' inability to know with certainty that occupancy permits would be obtained for all ticket sales falls short of the mark. At its base, plaintiffs simply complain that defendants were unable to live up to the contractual agreement. There is not one alleged fact to support the proposition that defendants had the intent to sell worthless tickets or did not have the intent at the time of contracting to perform as reflected in the agreement. To the contrary, plaintiffs merely point to defendants' asserted inability to know with certainty that they would be able to guarantee admission and a seat. And they highlight what at best can be viewed as negligent efforts by defendants and their contractors to commit sufficient resources to follow through with the contractual undertaking.

Making boiler plate allegations that a defendant's failure to live up to its contractual obligations proves that the statements concerning its ability to perform were false, fraudulent or misleading reflects nothing more than the epitome of a self-serving attempt to bootstrap a contract claim into one for fraud. Of course, "adding the words 'falsely' and 'negligently' to the representations made in the course of *reaching* an agreement does not convert what is essentially a breach of contract action into a fraud and negligence claim." Bishop v. GNC Franchising, LLC, 403 F. Supp.2d 411, 417 (W.D. Pa. 2005) (citing Galbieri v. Monsanto Co., 245 F. Supp.2d 636, 650 (E.D. Pa. 2002) ("[A] breach of contract claim cannot be 'bootstrapped' into a fraud claim merely by adding the words 'fraudulently induced.'")). And plaintiffs' extensive arguments to the effect that defendants had reason to know as the game drew closer that their ability to perform was becoming more in doubt does not change the origin of the duties allegedly breached by defendants or the manner by which plaintiffs became subjected to the harm about which they complain. Compare Caudill Seed and Warehouse Co., Inc. V. Prophet 21, Inc., 123 F. Supp.2d 826, 833-34 (E.D. Pa. 2000) (granting motion to dismiss fraud claims under gist of the action doctrine even though the defendant fraudulently strung the plaintiff along by repeatedly assuring that its products would work and live up to the promised benefits of the bargain); Harold v. McGann, 406 F. Supp.2d 562, 577 (E.D. Pa. 2005) (same); accord Simms v. Jones, 879 F. Supp.2d 595, 599-600 (N.D. Tx. 2012) (class action plaintiffs' attempt to advance tort claims where the NFL defendants' knew but failed to disclose that the tickets purchased by certain fans attending Super Bowl XLV were for "temporary seating, with the location of the seats subject to change depending on the location of available space in the stadium, and/or (b) obstructed" was precluded by the "independent injury rule" under Texas law, which provides that

9

"when the injury is only the economic loss to the subject of a contract, the action sounds only in contract.").[1]

It follows that the parties' dispute is defined by their contractual obligations and not by the larger social policies embodied in the law of torts. Such circumstances warrant the application of the gist of the action doctrine and, therefore, the NFL's and Dallas Cowboy's motions to dismiss plaintiffs' negligent misrepresentation claims (Counts II and III) have been granted.

### IV. Fraudulent Misrepresentation by Concealment and Fraudulent Inducement Claims, and UTPCPL Claim Against NFL

Plaintiffs assert that the NFL violated the UTPCPL by concealing information that their tickets were for "temporary seats" that did not exist and that the NFL and its agents only contemplated construction of those seats when the tickets were sold. Complaint at ¶ 159.

---

[1] Although Texas utilizes the "independent injury rule" to distinguish between cases where a party may proceed in tort as opposed to solely in contract, Pennsylvania law incorporates the same limitation on economic damages. Pennsylvania courts use two methods to determine whether tort claims that accompany contract claims should be allowed as freestanding causes of action or rejected as illegitimate attempts to procure additional damages for a breach of contract: the "gist of the action" test and the "economic loss doctrine" test. Bohler-Uddeholm American, Inc. v. Ellwood Group, Inc., 247 F.3d 79, 103 (3rd Cir. 2001), cert. denied, Ellwood City Forge Co. v. Bohler-Uddeholm America Inc., 534 U.S. 1162 (2002).

The economic loss doctrine is designed to place a check on limitless liability for manufacturers and establish clear boundaries between tort and contract law. Werwinski v. Ford Motor Co., 286 F.3d 661, 680-681 (3rd Cir. 2002). In Pennsylvania, the economic loss doctrine precludes recovery for economic losses in a negligence action where the plaintiff has suffered no physical injury or property damage. Aikens v. Baltimore & Ohio R.R. Co., 501 A.2d 277, 279 (Pa. Super. 1985) (no cause of action lies for negligence that causes only economic loss); Rock v. Voshell, 397 F. Supp.2d 616, 627-28 (E.D. Pa. 2005) (under Pennsylvania law economic loss doctrine bars negligence and negligence per se causes of action where damages are only for economic loss); Eagle Traffic Control v. Addco, 882 F. Supp. 417, 419 (E.D. Pa. 1995) (under Pennsylvania law economic loss doctrine applies to claims of negligent misrepresentation).

Here, plaintiffs assert nothing more than a laundry list of economic losses flowing from defendants' failure to perform on 4 temporary seats. These 4 were part of 2,400 seats for which defendants ultimately were unable to obtain occupancy permits (out of 20,000 temporary seats).

Furthermore, the NFL committed fraud in the inducement because it knew that the seats did not exist at the time the tickets were sold and that plaintiffs would have relied on the representation that the tickets were for seats fit for occupancy. Id. at ¶¶ 119-125. The NFL moves to dismiss these claims on the ground that, among other things, plaintiffs have failed to allege any specific facts supporting a plausible inference that it made a representation or omission "(i) with knowledge of its falsity or recklessness as to its truth and (ii) with the intent of misleading Plaintiffs into relying on the misrepresentation or omission." The NFL's Brief in Support (Doc. No. 57) at 15.

Plaintiffs' UTPCPL and fraudulent inducement claims are barred by the gist of the action doctrine. These claims arise for the same duties and obligations as plaintiffs' negligent misrepresentation claims and those duties and obligations have the same factual and legal origin. Consequently, these claims likewise are barred by the gist of the action doctrine.

Moreover, the economic loss doctrine "prohibits plaintiffs from recovering in tort economic losses to which their entitlement flows only from contract." Werwinski, 286 F.3d at 671 (quoting Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 618 (3d Cir.1995)). It is only "where the alleged breach arises from a social policy or standard [as opposed to the parties' agreement], [that] the tort remedy is appropriate." Wulf v. Bank of America, 798 F. Supp.2d 586, 595 (E.D. Pa. 2011).

In Werwinski, the United States Court of Appeals for the Third Circuit predicted that the Pennsylvania Supreme Court would adopt the economic loss doctrine and apply it in cases involving individual consumers asserting claims of fraudulent misrepresentation and concealment. 286 F.3d at 671-74. In other words, a plaintiffs may bring fraud claims "only if the fraud is 'extraneous to the contract,' not 'interwoven with the breach of contract.'" Id. at 676 (quoting Huron Tool & Engineering Co. v. Precision Consulting Servs., Inc., 532 N.W.2d 541,

545 (Mich. Ct. App. 1995)). The court held that the same policy considerations justify the application of the economic loss doctrine to claims brought pursuant to the UTPCPL. Id. at 681 ("Inasmuch as the same policy justifications for applying the doctrine to appellants' common law intentional fraud claims support the doctrine's application to appellants' UTPCPL claims, we will affirm the district court's order with respect to these statutory claims."). It further held that the doctrine extends to claims of fraudulent inducement involving goods and products. Id. (". . . the district court correctly applied the economic loss doctrine to appellants' fraudulent concealment claims.").

The above authorities warrant dismissal of plaintiff's UTPCPL and fraudulent inducement claims for two reasons. First, as to fraud claims predicated on the UTPCPL, Werwinski is directly on point and is controlling authority. See Wulf, 798 F. Supp.2d at 595-96 ("Despite several cases questioning Werwinski, none have come from the Pennsylvania Supreme Court or the Third Circuit. Therefore, this court is bound by Werwinski."); Itzkoff v. F & G Realty of New Jersey, Corp., 890 F. Supp. 351, 356 (D. New Jersey 1995) (In determining issues of state law where the state supreme court has not spoken, district courts are to give proper regard to decisions of the intermediate appellate courts but are bound by decisions of the Third Circuit predicting how the state supreme court would rule.). Thus, plaintiffs' UTPCPL claim must be dismissed under Werwinski.

Second, the rationale employed by Werwinski to bar fraudulent inducement claims in connection with the sales of new automobiles applies with equal force in the instant context. Plaintiffs appear to have a remedy through contract which could provide recovery for any and all

actual monetary losses that plaintiffs incurred as a result of the ticket sales.[2] The harms suffered by plaintiffs were not affected by the mental state of the NFL when the tickets were sold. Compare id. at 679-80 ("As Ford points out, the mental state of the wrongdoer is irrelevant from the buyer's perspective: a plaintiff suffers the same harm - i.e., economic losses - regardless of whether the misrepresentation is innocent, negligent, or intentional."). And the very nature of the doctrine is to maintain a proper check on the expansion of liability and provide clear boundaries between tort and contract law. Id. It follows that plaintiffs' intentional fraud claims are barred by the economic loss doctrine.

Defendants also move for dismissal of the entire action due to lack of diversity jurisdiction. They essentially argue that even if plaintiffs' tort and UTPCLP claims are taken into account, the amount in controversy cannot be satisfied by each individual plaintiff. Thus, they maintain that subject matter jurisdiction does not exist.

In determining the amount in controversy, the general rule is to turn to the complaint to determine the amount recoverable. Horton v. Liberty Mutual Ins. Co., 367 U.S. 348, 353 (1961). Accordingly, the court must review the claims advanced and any amount initially requested in conjunction therewith in order to determine if the amount in controversy is satisfied. Angus v. Shiley Inc., 989 F.2d 142, 145-46 (3d Cir. 1993) (A reasonable reading of the value of the claims to be litigated is the appropriate standard to be used when determining the amount in question.); Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 347 (1977) (same); Carey v. Pennsylvania Enters., Inc., 876 F.2d 333, 337 n. 12 (3d Cir. 1989) (same).

---

[2] Of course, the various forms of consequential damages comprising plaintiffs' economic losses appear to fall squarely within the scope of consequential damages recoverable under Hadley v. Baxendale, 9 Exch. 341, 156 Eng. Rep. 145 (1854). See Krauss v. Greenbarg, 137 F.2d 569, 570-71 (3d Cir. 1943) (noting the incorporation of Hadley into Pennsylvania's common law of contracts) (collecting cases).

13

The Supreme Court long ago set forth the standard for ascertaining whether a plaintiff's claims satisfy the amount in controversy requirement in St. Paul Mercury Indemnity Co. v. Red Cab Co., 303 U.S. 283 1938). There, the Court observed:

> The rule governing dismissal for want of jurisdiction in cases brought in the federal court is that, unless the law gives a different rule, the sum claimed by the plaintiff controls if the claim is apparently made in good faith. It must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal.

Id. at 288-89; see also Nelson v. Keefer, 451 F.2d 289, 292-93 (3d Cir.1971); Suber v. Chrysler Corp., 104 F.3d 578, 583 (3d Cir. 1997). "Once a good faith pleading of the amount in controversy vests the district court with diversity jurisdiction, the court retains jurisdiction even if the plaintiff cannot ultimately prove all of the counts of the complaint or does not actually recover damages in excess of [the threshold level needed to satisfy the amount in controversy]." Suber, 104 F.3d at 583. (citing St. Paul Mercury, 303 U.S. at 288).

The evaluation of whether the plaintiff can satisfy the amount in controversy is to be conducted based on the value of the claims at the time the complaint was filed. Suber, 104 F.3d at 583. Although it generally is appropriate to rely on the plaintiff's allegations of the amount in controversy as contained in the complaint, "where a defendant or the court challenges the plaintiff's allegations regarding the amount in question, the plaintiff who seeks the assistance of the federal courts must produce sufficient evidence to justify its claims." Id. (quoting Columbia Gas, 62 F.3d at 541). Once subject matter jurisdiction has been challenged, the party invoking jurisdiction must be given an opportunity to present facts or other information bearing on the issue. Id. (citing Berardi v. Swanson Memorial Lodge No. 48 of the Fraternal Order of Police, 920 F.2d 198, 200 (3d Cir. 1990); Local 336, American Federation of Musicians, AFL-CIO v. Bonatz, 475 F.2d 433, 437 (3d Cir.1973); 5A Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1350, at 213-18 (2d ed. 1990)).

The threshold needed to withstand a motion to dismiss under Rule 12(b)(1) is "lower than that required to withstand a Rule 12(b)(6) motion." Id. Evaluating whether the amount in controversy was present at the time of filing involves only minimal scrutiny of the plaintiff's claims. Id. Assessing the legal sufficiency of well found claims brought in good faith and/or the probabilities of recovery on such claims is beyond the scope of the evaluation. It nevertheless is at times appropriate and necessary to evaluate the potential damages a plaintiff could recover under the viable claims presents. Id. Pursuant to that undertaking "dismissal is appropriate only if the federal court is certain that the jurisdictional amount cannot be met." Id. (quoting Columbia Gas Transmission Corp. v. Tarbuck, 62 F.3d 538, 541 (3d Cir.1995) and comparing Lunderstadt v. Colafella, 885 F.2d 66, 69-70 (3d Cir.1989) (holding in a federal question case that "a federal court may dismiss for lack of jurisdiction only if the claims are 'insubstantial on their face'").

It appears to a legal certainty that plaintiffs cannot recover the amount in controversy under any viable theory which may be advanced to support a recovery for the injuries sustained. In the face of defendants' challenge to subject matter jurisdiction plaintiffs have failed to come forward with a sufficient good-faith basis to satisfy the amount in controversy requirement. The tort claims are not and were not viable causes of action upon which four claims for more than $75,000 could have been advanced. This leaves for consideration plaintiffs' ability to recover in contract.

Plaintiffs identified the following actual damages in their initial disclosures:

Richard Pollock & Cheryl Pollock:

    I.     Pittsburgh Steelers Lottery (Super Bowl XLV tickets) $1,631.00;
    II.    Super Bowl XLV Tour (Shadyside Travel): $3,138.00;
    III.   Attorney's Fees:                 To be determined
    IV.   Costs related to Lawsuit:        To be determined

Cynthia P. Kutcher & Paul L. Kutcher:

| | | |
|---|---|---|
| I. | Pittsburgh Steelers Lottery (Super Bowl XLV tickets) | $1,631.00; |
| II. | Airfare (Roundtrip from Tampa to Dallas) | $565.60 |
| III. | Automobile rental | $163.93 |
| IV. | Hotel Accommodations | $998.97 |
| V. | Food & Beverage | $169.93 |
| VI. | Gas | $10.00 |
| V. | Attorneys Fees | To be determined |
| VI. | Costs related to Lawsuit | To be determined |

In the face of defendants' challenge to subject matter jurisdiction plaintiffs reference their purported ability to recover (1) punitive damages on their tort claims and (2) attorneys fees and treble damages on their UTPCPL claims. They also claim the right to recover for the loss of "a once in a life time" opportunity to watch their sports team at the Super Bowl.

The assessment of whether the amount in controversy is present in any given situation "should be objective and not based on fanciful, 'pie-in-the-sky,' or simply wishful amounts, because otherwise the policy to limit diversity jurisdiction will be frustrated." <u>Sammuel-Bassett v. Kia Motors America, Inc.</u>, 357 F.3d 392, 403 (3d Cir. 2004). Plaintiffs have identified actual losses of $2,384.50 each for the Pollocks and $954.21 for each of the Kutchers. "Each plaintiff must meet the amount in controversy requirement - claims may not be aggregated among plaintiffs to meet the statutory minimum." <u>Golden ex. rel. Golden v. Golden</u>, 382 F.3d 348, 355 (3d Cir. 2004). Given the lack of viable claims to support awards for punitive damages, attorneys fees, and treble damages, it appears to a legal certainty that plaintiffs cannot individually recover the threshold level for diversity jurisdiction to attach. Consequently, the action must be dismissed for want of jurisdiction.

s/ David Stewart Cercone<br>
David Stewart Cercone<br>
United States District Judge

cc: Paul L. Kutcher, Esquire
Charles B. Gibbons, Esquire
Daniel H. Gold, Esquire
Thad Behrens, Esquire
Brian H. Simmons, Esquire
Christopher M. Buell, Esquire
Paul A. Grinke, Esquire
David W. Dodge, Esquire
Levi G. McCathern, II, Esquire
James V. Corbelli, Esquire

(*Via CM/ECF Electronic Mail*)